UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


WILLIAM SHINAVER,

               Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

               Defendant.

_____/

Hon. Gordon J. Quist

Case No. 1:08-CV-955


## REPORT AND RECOMMENDATION

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive.

Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **reversed and this matter remanded for further factual findings**.

**STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial

interference.  *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted).  This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision.  *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 39 years of age at the time of the ALJ's decision.  (Tr. 24, 58).  He completed the eleventh grade and previously as a machine operator, laborer, salesperson, and stockperson.  (Tr. 71-76, 88-89).

Plaintiff applied for benefits on March 21, 2005, alleging that he had been disabled since August 18, 2004, due to cognitive difficulties, seizures, and hypertension.  (Tr. 58-60).  Plaintiff's application was denied, after which time he requested a hearing before an Administrative Law Judge (ALJ).  (Tr. 25-57).  On May 1, 2008, Plaintiff appeared before ALJ B. Lloyd Blair, with testimony being offered by Plaintiff and vocational expert, Dr. Norman Abeles.  (Tr. 273-99).  In a written decision dated May 23, 2008, the ALJ determined that Plaintiff was not disabled as defined by the Social Security Act.  (Tr. 11-24).  The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter.  (Tr. 2-5).  Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## RELEVANT MEDICAL HISTORY

On September 14, 2004, Plaintiff participated in a CT scan of his head, the results of which revealed "no evidence of any acute intracranial abnormality." (Tr. 249).

On September 17, 2004, Plaintiff reported to an emergency room complaining that he felt "drunk" and "out of it." (Tr. 233). The results of an examination were unremarkable and Plaintiff was diagnosed with hypertension and acute vertigo. (Tr. 233).

On January 20, 2005, Plaintiff participated in an EEG examination, the results of which were "normal." (Tr. 260). On January 27, 2005, Plaintiff participated in an MRI examination of his brain, the results of which revealed that Plaintiff's "brain volume is mildly reduced, out of proportion to [his] age" but was otherwise "unremarkable" with no evidence of "mass or abnormal enhancement." (Tr. 254-55).

On March 22, 2005, Plaintiff participated in a neurologic evaluation conducted by Dr. Stephen Burton. (Tr. 230-31). Plaintiff reported that he began experiencing "unusual spells" after working "near a blast furnace." (Tr. 230). Plaintiff reported that he experiences these spells "almost daily" and that "it would be uncommon to go three days without an event." (Tr. 230). Plaintiff reported that these spells "last between 15 and 45 minutes," during which time he feels drowsy and loses the ability to think. (Tr. 230). The results of a neurological examination were "normal." (Tr. 230). Dr. Burton doubted that Plaintiff's spells were epileptic in nature. (Tr. 231). The doctor recommended that Plaintiff undergo further testing. (Tr. 231).

Plaintiff was again examined by Dr. Burton on May 3, 2005. (Tr. 228). The results of a neurological examination were "normal." The doctor concluded that Plaintiff was experiencing "an anxiety depressive state." (Tr. 228).

On May 31, 2005, Plaintiff participated in a psychological evaluation conducted by J. Keith Ostein, Ph.D. (Tr. 172-76). Plaintiff reported that he injured his head "a year ago" and as a result is unable to work. (Tr. 172). Plaintiff reported that, "I'm not always with it. I draw blanks." (Tr. 172). He further reported that "[i]t's like a tight band around my head and ringing in my ears." (Tr. 172).

Plaintiff participated in intelligence testing, the results of which revealed that he possessed a verbal IQ of 81, a performance IQ of 86, and a full scale IQ of 82. (Tr. 173). Dr. Ostein characterized Plaintiff's performance as falling within the "low normal" range of functioning. (Tr. 173). The doctor observed that "[t]hroughout the evaluation [Plaintiff] exhibited a pattern of generalized slowness in his cognitive processing speed and cognitive efficiency." (Tr. 173). The doctor reported that Plaintiff made a "forthright effort" during this testing and that such "provide a valid measure of his current cognitive and academic levels of functioning." (Tr. 173).

Plaintiff reported that he used to enjoy "building computers and putting them together," but that he no longer does so. (Tr. 174). He also reported that his daily activities consist of watching television, "helping out around the house," and "helping his friends with their children." (Tr. 174). Plaintiff exhibited a "very flat affect, and at times seemed rather groggy and vague in his responses." (Tr. 174). Plaintiff was also "very confused and stressed about his current cognitive functioning." (Tr. 174). Plaintiff was diagnosed with mood disorder, with stress and worry, due to vague cognitive changes. (Tr. 175). His GAF score was rated as 55.[1] (Tr. 176).

---

[1] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 1994) (hereinafter DSM-IV). A GAF score of 55 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning." DSM-IV at 34.

On July 30, 2006, Plaintiff reported to the emergency room. (Tr. 143). He was "shaking" and his "thought process [was] off." (Tr. 143). Plaintiff participated in a CT scan of his brain, the results of which revealed "mild generalized cerebral cortical atrophy," but there was otherwise no evidence of acute intracranial process or acute abnormality. (Tr. 147-48).

On August 2, 2006, Plaintiff participated in a psychological evaluation conducted by Dr. Ostein. (Tr. 181-85). Plaintiff reported that he continued to experience "intense pressure in his head and that it hurts terribly at times." (Tr. 181). The doctor noted that Plaintiff "appeared dramatically more stressed, anxious and dysfunctional" than when he examined Plaintiff the previous year. (Tr. 181). Plaintiff "exhibited patterns of significantly reduced cognitive processing speed," as well as "very slow and intermittent speech." (Tr. 181). Plaintiff "had no eye contact, and at times had a very vacant look." (Tr. 181). The results of intelligence testing revealed that Plaintiff possessed a verbal IQ of 74, a performance IQ of 94, and a full-scale IQ of 81. (Tr. 183).

Plaintiff reported that he "currently has no social contact other than with the people with whom he is living." (Tr. 183). Plaintiff reported that his daily activities consist of watching television and sitting outside. (Tr. 183). Plaintiff exhibited no evidence of an underlying thought disorder. (Tr. 183). Dr. Ostein diagnosed Plaintiff with generalized anxiety disorder, with intermittent panic attacks. (Tr. 184). The doctor further recommended that Plaintiff "be referred to a neurologist for a comprehensive medical work-up to try to identify what, if any, cognitive problem might be going on." (Tr. 185).

Treatment notes dated April 19, 2007, indicate that Plaintiff was experiencing "declining processing skills." (Tr. 198). Treatment notes dated, May 17, 2007, indicate that Plaintiff's "shaking is back." (Tr. 113).

6

On May 17, 2007, Dr. Peter Cooke completed a report concerning Plaintiff's functional limitations. (Tr. 200). The doctor reported that during an 8-hour workday, Plaintiff is unable to lift or carry any amount of weight. (Tr. 200). The doctor reported that during an 8-hour workday, Plaintiff can "sit less than 6 hours" and "stand and/or walk less than 2 hours." (Tr. 200). Dr. Cooke reported that Plaintiff was unable to use his upper or lower extremities to engage in grasping, reaching, pushing, pulling, or manipulation activities. (Tr. 200). The doctor also reported that Plaintiff experienced difficulty in the following areas: (1) comprehension, (2) memory, (3) sustained concentration, (4) following simple directions, (5) reading/writing, and (6) social interaction. (Tr. 200).

On July 2, 2007, Plaintiff participated in a psychological evaluation conducted by Cynthia Logan, M.A., Limited License Psychologist. (Tr. 168-71). Plaintiff reported experiencing pain and anxiety. (Tr. 169). Plaintiff was cooperative and exhibited appropriate thought content, but his concentration was "hindered" and his memory "appeared impaired." (Tr. 169). Logan also observed that Plaintiff's "hands had tremors." (Tr. 169). Plaintiff reported that his difficulties began after suffering a work-related injury involving a kiln. (Tr. 169). Plaintiff reported that he was able to shop, prepare his own meals, wash laundry, and care for his personal needs. (Tr. 170). Plaintiff was diagnosed with adjustment disorder with mixed anxiety and depressed mood, chronic. (Tr. 170). His GAF score was rated as 57. (Tr. 171).

On January 31, 2008, Plaintiff was again examined by Dr. Ostein. (Tr. 103-11). The doctor observed that "when I went to the waiting room to get [Plaintiff], he had great difficulty getting up, leaned very much to his right, and had a severe limp." (Tr. 104). Plaintiff again participated in intelligence testing, the results of which revealed that he possessed a verbal IQ of 74,

a performance IQ of 92, and a full-scale IQ of 80. (Tr. 104-05). Dr. Ostein observed that Plaintiff

"had a very severe fine motor tremor and had tremendous difficulty completing the Digit Symbol

subtest." (Tr. 104). The doctor noted that if Plaintiff's score on the digit symbol subtest is excluded

his performance IQ score drops to 84. (Tr. 104).

Plaintiff reported that "he is not able to do much of anything each day other than

shower, have coffee, watch television, and sometimes "tinker on the computer." (Tr. 105). Plaintiff

also reported that he "sometimes does his laundry." (Tr. 105). Dr. Ostein observed that Plaintiff

was "extremely anxious" and "completely overwhelmed by his current life situation." (Tr. 105).

The doctor observed that Plaintiff "spoke extremely slowly, and he seemed to have great difficulty

getting any thoughts out." (Tr. 105). Plaintiff did not exhibit any evidence of abnormal mental

activity or ideation. (Tr. 105). Plaintiff was diagnosed with (1) generalized anxiety disorder, with

intermittent panic attacks; and (2) mood disorder, with intense anxiety and stress. (Tr. 106).

Plaintiff's GAF score was rated as 50.[2] (Tr. 106).

Dr. Ostein also completed a Statement of Ability to do Work-Related Activities

(Mental) form regarding Plaintiff's non-exertional limitations. (Tr. 109-10). With respect to

Plaintiff's ability to understand, remember, and carry out simple instructions, the doctor reported

that Plaintiff experienced "mild" limitations. (Tr. 109). Plaintiff's limitations were characterized

as "moderate" in the following areas: (1) ability to make judgements on work-related decisions, and

(2) understand, remember, and carry out complex instructions. (Tr. 109). Dr. Ostein reported that

Plaintiff experienced "marked" limitations in the following areas: (1) interact appropriately with the

---

[2] A GAF score of 50 indicates that the individual is experiencing "serious symptoms or any serious impairment in social, occupational, or school functioning." DSM-IV at 34.

public, supervisors, or co-workers, and (2) ability to respond appropriately to changes in routine work setting. (Tr. 110).

Plaintiff testified at the administrative hearing. (Tr. 278-84). However, the ALJ's questioning of Plaintiff can best be described as superficial and cursory. (Tr. 278-84). Patricia Blooding also testified at the administrative hearing. (Tr. 284-92). Blooding testified that she has known Plaintiff for many years and that he has resided in her home since December 2000. (Tr. 285). She indicated that Plaintiff began experiencing difficulties following a workplace accident that occurred around August 2004. (Tr. 285). Blooding testified that she was presently Plaintiff's "caregiver." (Tr. 285). She reported that she takes Plaintiff shopping and to doctors' appointments, makes telephone calls for him, "remind[s] him to eat," and "pretty much anything else that he's not capable of doing." (Tr. 285-86). Blooding testified that Plaintiff experiences shakes and tremors that require "several hours to get through." (Tr. 287). Blooding reported that Plaintiff suffers severe difficulties in the areas of concentration and memory. (Tr. 288). Blooding testified that Plaintiff's condition is "getting worse." (Tr. 291).

## ANALYSIS OF THE ALJ'S DECISION

### A. Applicable Standards

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[3] If the Commissioner can make a

---

[3] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled"

dispositive finding at any point in the review, no further finding is required.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).   The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining his residual functional capacity.  *See* 20 C.F.R. §§ 404.1545, 416.945.

## B.  <u>The ALJ's Decision</u>

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and he can satisfy his burden by demonstrating that his impairments are so severe that he is unable to perform his previous work, and cannot, considering his age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy.  *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

The Commissioner has established a five-step disability determination procedure. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which his residual functioning capacity (RFC) is determined.  *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

---

will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

At step two, the ALJ determined that Plaintiff suffered from generalized anxiety disorder, a severe impairment. (Tr. 13). At step three, the ALJ determined that Plaintiff did not suffer from any impairment or combination of impairments that satisfied the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 18).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the ability to perform light work,[4] subject to the following limitations: (1) he cannot climb ladders, ropes, or scaffolds; (2) he can occasionally stoop, crouch, kneel, and crawl; (3) he cannot work with dangerous machinery or at unprotected heights; (4) he is limited to unskilled work with minimal personal interaction, contact, or discussion with co-workers; (5) he is limited to work that involves minimal contact and directions from a supervisor; and (6) he is limited to work requiring only brief and superficial contact with the general public. (Tr. 19).

At step five, the ALJ determined that Plaintiff was unable to perform his past relevant work. (Tr. 22). At this point, the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff can perform, his limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform specific jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that

---

[4] Light work involves lifting "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567. Furthermore, work is considered "light" when it involves "a good deal of walking or standing," defined as "approximately 6 hours of an 8-hour workday." 20 C.F.R. § 404.1567; Titles II and XVI: Determining Capability to do Other Work - the Medical-Vocational Rules of Appendix 2, SSR 83-10, 1983 WL 31251 at *6 (S.S.A., 1983).

the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964.

Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Norman Abeles.

The vocational expert testified that "if [Plaintiff] could do sustained work, eight hours a day, 40 hours a week, and meet production demands," there existed approximately 81,000 jobs in the lower half of the lower peninsula of Michigan which Plaintiff could perform consistent with the ALJ's RFC determination. (Tr. 295-96). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988). Accordingly, the ALJ determined that Plaintiff did not qualify for disability benefits.

a. The ALJ's determination regarding Plaintiff's RFC is not supported by substantial evidence

A claimant's RFC represents his ability to perform "work-related physical and mental activities in a work setting on a regular and continuing basis," defined as "8 hours a day, for 5 days a week, or an equivalent work schedule." Social Security Ruling 96-8P, 1996 WL 374184 at *1 (Social Security Administration, July 2, 1996); *see also*, *White v. Commissioner of Social Security*, 312 Fed. Appx. 779, 786 (6th Cir., Feb. 24, 2009) (same); *Shaw v. Apfel*, 220 F.3d 937, 939 (8th Cir. 2000) (same); *Lanclos v. Apfel*, 2000 WL 1054893 at *3, n.3 (9th Cir., July 31, 2000) (same); *Moore v. Sullivan*, 895 F.2d 1065, 1069 (5th Cir. 1990) (to properly conclude that a claimant is capable of performing work requires "a determination that the claimant can *hold* whatever job he finds for a significant period of time").

The ALJ's RFC determination suffers from at least two shortcomings. First, the ALJ placed great reliance on Plaintiff's reported activities. Specifically, the ALJ determined that Plaintiff "has described daily activities which are not limited to the extent one would expect, given his complaints of disabling symptoms and limitations." (Tr. 20). This conclusion is not supported by the evidence. Plaintiff has consistently reported that he performs a very limited range of activities and that he often requires help with such. Patricia Blooding testified that Plaintiff requires assistance when performing even the simplest of household chores. Such activities hardly equate with the ability to perform substantial gainful activity on a full-time basis. *See, e.g., Rogers v. Commissioner of Social Security*, 486 F.3d 234, 248-49 (6th Cir. 2007) (recognizing that the ability to perform "minimal daily functions" such as driving, housecleaning, laundry, reading, and watching television are "not comparable to typical work activities").

The ALJ also placed significant weight on the fact that the results of objective medical testing (EEG, CT scan, and MRI) have been overwhelmingly negative or unremarkable. The Court finds the ALJ's reliance on such to be misplaced. The evidence in this matter clearly establishes that Plaintiff suffers significant cognitive limitations, as well as shakes and tremors of some (as of yet) unknown origin. The medical professionals that have examined Plaintiff have witnessed such and expressed the opinion that Plaintiff suffers from an undiagnosed neurological impairment. Patricia Blooding has witnessed Plaintiff suffering shakes and tremors. The evidence indicates that Plaintiff's impairments (and the limitations resulting therefrom) have worsened over time. Moreover, nobody that has examined Plaintiff has suggested that Plaintiff is untruthful or has exaggerated his symptoms or limitations.

13

The Court recognizes the significance of objective medical testing in the disability evaluation process. Nonetheless, the ALJ cannot completely disregard the apparent neurological difficulties Plaintiff is experiencing simply because Plaintiff's care providers have yet to determine the origins thereof. Moreover, it has been recognized that certain types of traumatic brain injury "cannot be seen on an MRI or CAT scan,"[5] but instead require the individual to undergo "a sophisticated scan such as. . .a PET scan, or a. . .SPECT scan." *Harris v. United States*, 2005 WL 2886217 at \*10 (E.D.Pa., Nov. 2, 2005); *see also*, *In re Welding Fume Products*, 2005 WL 1868046 at \*26 n.50 (N.D.Ohio, Aug. 8, 2005) (recognizing that "magnetic resonance imaging ("MRI scans") and computerized axial tomography ("CAT scans"), are used to evaluate brain *structure* and to produce anatomical images, as opposed to PET and SPECT scans, which measure actual neurochemical *processes* within the brain"). There is no evidence that Plaintiff has been offered either a PET scan or a SPECT scan.

That Plaintiff suffers from some form of neurological disorder that impairs him to an extent beyond that recognized by the ALJ is further supported by medical evidence which Plaintiff first submitted to the Appeals Council and this Court. (Tr. 263-66). This evidence reveals that following a May 21, 2008 examination, Plaintiff was diagnosed as suffering from dementia and major depressive disorder. (Tr. 266). Plaintiff's GAF score was rated as 40.[6] (Tr. 266). The Court realizes that it cannot consider this information when evaluating the ALJ's decision in this matter. See *Cline v. Commissioner of Social Security*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*,

_____

[5] There is no difference between a CT scan and a CAT scan, they both refer to the same type of examination. *See* Computerized Axial Tomography (CAT Scan/CT Scan), available at http://www.medicinenet.com/cat_scan/article.htm (last visited on July 30, 2009).

[6] A GAF score of 40 indicates that the individual is experiencing "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." DSM-IV at 34.

14

2 F.3d 692, 695-96 (6th Cir. 1993). Nevertheless, this material further confirms that Plaintiff suffers from a neurological impairment that limits him to an extent beyond that recognized by the ALJ. Accordingly, for the reasons herein discussed, the undersigned finds that the ALJ's RFC determination is not supported by substantial evidence.

As indicated above, the ALJ determined that Plaintiff was unable to perform his past relevant work, at which point the burden of proof shifted to the ALJ to demonstrate that there existed a significant number of jobs which Plaintiff could perform, his limitations notwithstanding. In attempting to satisfy his burden, the ALJ relied upon the testimony of the vocational expert, who in response to the ALJ's hypothetical question identified a significant number of jobs which a person with Plaintiff's RFC could perform.

As previously noted, however, the ALJ's RFC determination is not sufficiently supported by the evidence. In short, therefore, the hypothetical question, the response to which the ALJ relied upon to support his decision, was based upon an improper RFC determination. Accordingly, the ALJ's conclusion that there exist a significant number of jobs which Plaintiff can perform despite his limitations, and that Plaintiff is therefore not disabled, is supported by less than substantial evidence. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir. 1996) (while the ALJ may rely upon responses to hypothetical questions posed to a vocational expert, such hypothetical questions must accurately portray the claimant's physical and mental impairments).

b.      Evidence of Plaintiff's disability is not compelling

While the ALJ's decision is not supported by substantial evidence, Plaintiff can be awarded benefits only if proof of his disability is "compelling." *Faucher v. Sec'y of Health and Human Services*, 17 F.3d 171, 176 (6th Cir. 1994) (the court can reverse the Commissioner's decision and immediately award benefits if all essential factual issues have been resolved and proof of disability is compelling).

While the ALJ's decision fails to comply with the relevant legal standard, neither is the evidence of Plaintiff's disability compelling. Determining the true extent to which Plaintiff is capable of performing work activities is a factual matter. Furthermore, once an accurate RFC is developed for Plaintiff it must then be determined whether there exist a significant number of jobs which he can perform consistent with his RFC. These are factual issues which this Court is not permitted to resolve. Instead, this matter must be remanded for the consideration of these (and any other relevant) issues.

## CONCLUSION

For the reasons articulated herein, the Court concludes that the ALJ's decision does not conform to the proper legal standards and is not supported by substantial evidence. Accordingly, the Court recommends that the Commissioner's decision be **reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure

to file objections within the specified time waives the right to appeal the District Court's order. *See*

*Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


Date:  August 5, 2009                                    /s/ Ellen S. Carmody
                                                         ELLEN S. CARMODY
                                                         United States Magistrate Judge